# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

STATE OF DELAWARE,⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀v.⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀⠀⠀ID. No. 1705014681
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
ELDER SAAVEDRA,⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀Defendant.⠀⠀⠀)

Submitted: May 2, 2025
Decided: August 13, 2025

## COMMISSIONER'S REPORT AND RECOMMENDATION THAT DEFENDANT'S MOTION FOR POSTCONVICTION RELIEF SHOULD BE SUMMARILY DISMISSED

Brian Arban, Deputy Attorney General, Department of Justice, Wilmington, Delaware, Attorney for the State.

Christopher S. Koyste, Esquire, postconviction counsel for Defendant.

Todd E. Henry, Esquire, counsel for Defendant.

Elder Saavedra, James T. Vaughn Correctional Center, Smyrna, Delaware.

**O'Connor, Commissioner.**

This 13th day of August, 2025, upon consideration of Defendant's Motion for Postconviction Relief,[1] postconviction counsel's Motion to Withdraw, the State's Response to Defendant's Motion for Postconviction Relief, Trial Counsel's Affidavit, Defendant's Reply to Counsel's Affidavit, and the record in this matter, the following is my Report and Recommendation.

## I.    BACKGROUND FACTS

On January 30, 2020, the Delaware Supreme Court set forth the following facts in its Opinion affirming Elder Saavedra's ("Defendant" or "Saavedra") convictions on direct appeal:

> On the evening of March 25, 2017, Lester Mateo ("Mateo"), accompanied by several friends, drove a Cadillac Escalade belonging to a friend's sister to a nightclub in Bear, Delaware called El Nuevo Rodeo. As the evening passed into the early morning hours of March 26, Elder Saavedra, who was at the club with his brother, Carlos, and his cousin, Brian, started a scuffle on the club's dance floor by shoving one of Mateo's friends, Yosimar DeLeon-Lopez. The nightclub's security staff quickly moved to separate Saavedra and his friends from DeLeon-Lopez, Mateo, and their friends, escorting the latter group out the club's front door while Saavedra's group was escorted out a side door. As DeLeon-Lopez was leaving the club through its main door, he saw the person who had pushed him on the dance floor and heard him say: "Guatemala" – an apparent reference to Mateo's group – "is going to die." DeLeon-Lopez later identified Saavedra in a photographic lineup conducted at the police station as the man who pushed him and confirmed that identification at trial. Two other witnesses—Irwin Ramirez-Recinos and Fernando Castillo de Leon— also identified Saavedra as the person who started the scuffle on the dance floor. Witnesses described Saavedra's demeanor variously as "insult[ing]," "mad and drunk," and itching for a fight.

---

[1]  Docket Item ("D.I.") 47.

1

After the altercation, Mateo, who was his group's designated driver, walked hurriedly and then ran to the Escalade, got in, and drove it to the edge of the parking lot near the east end of the building. For reasons that are unclear, Mateo then got out of the vehicle, with the engine running and the front driver's side door open, and began to walk toward the nightclub's entrance. But he didn't get far. Almost immediately, two individuals from Saavedra's group, Brian Saavedra and Carlos Saavedra, began to chase him, belts and buckles in hand. A doorman came to Mateo's aide by spraying the two pursuers with pepper spray. But Mateo was not out of harm's way. Another individual, ultimately identified by Madelyn Aramiz as Elder Saavedra, had hopped into the running Escalade and now pointed it in Mateo's direction. Try as he might to evade the speeding Escalade, Mateo was unable to get away. Saavedra caused the Escalade to leap a curb and then accelerated, ramming the vehicle violently into the fleeing Mateo resulting in his death from blunt force injuries.

The police arrived at the scene within a matter of minutes. Detective Scott Mauchin of the Delaware State Police, who was designated as the chief investigating officer, arrived approximately one hour later and began the process of identifying and interviewing witnesses and gathering surveillance video evidence, which, as will be discussed in detail later, was extensive.

One of the witnesses who came forward was Madelyn Aramiz. Ms. Aramiz had been at El Nuevo Rodeo that evening since it opened at 9:00, but in the ensuing four hours she had only "one drink and that was it." Around 1:00 a.m., Aramiz "noticed the security guards running to an area," which she interpreted as some sort of trouble brewing so, being tired anyway, she decided to leave the club and wait in her cousin's van for her cousin who was dancing. Shortly after entering the van, she heard what she described as a "scuffle" behind it. She looked out and noticed a person walking "alongside ... [a] black car." She watched from two parking spaces away as that person, who "looked spooked," turned to run. But, as she put it, "the truck floored it and ran right in [to him]." Her conclusion that "the truck floored it" was based on how loud the engine sounded.

Aramiz immediately looked at the person who was driving the truck. She watched as the driver opened the door of the truck. At trial, she described what she saw next:

> I saw him jump out. I saw him jump out of the driver's
> side. And then he proceeded to run. But he stood directly

2

in front of the van that I was sitting in pretty much. And he stood there. He had a belt wrapped around his hand with a big buckle. He stood there for a few seconds. And then he kind of smirked and did a little hippity-hop. And then he said "la migra." And then he ran off.

Aramiz waited for a security guard to arrive before getting out of the van. She told the guard that "there was someone lying there [and] that he was probably dead." She then called 911. She spoke to the police initially at the scene, but it is unclear what she told them at the time. We do know, however, that she met with the police later that week and picked a photograph of Elder Saavedra out of a photographic lineup, identifying him as the person she saw getting out of the vehicle after it struck Lester Mateo.

Although the police secured these identifications of Elder Saavedra during the week following Mateo's death—by Yosimar DeLeon-Lopez, Irwin Ramirez-Recinos, and Fernando Castillo de Leon as the instigator of the dance-floor altercation and by Madelyn Aramiz as the driver of the Cadillac Escalade that caused Mateo's death—Saavedra was not arrested for several weeks following the crime. That is because Saavedra left Delaware ostensibly to evade detection and arrest. According to cell-tower location information obtained through a search warrant, Saavedra's cell phone connected to a cell tower in North Carolina approximately seven hours after the collision in the dance club parking lot. A day and a half later, according to the cell phone call detail records, Saavedra was in New York City.

Other evidence tended to show that Saavedra was fleeing the consequences of his actions at El Nuevo Rodeo. For instance, having never missed a paycheck in the three and one-half years during which he worked for a local commercial office furniture company, Saavedra "stopped showing up for work" on March 27 according to the company's owner, leaving two paychecks unclaimed.

A former girlfriend of Saavedra's, Mariela Conejo-Cintura, provided additional insight into his activities and state of mind in the wake of Mateo's death. Conejo-Cintura was in El Nuevo Rodeo and saw Saavedra "fighting with [the] friends, family of the boy- - the guy," but she didn't see how the fight started. She had no direct contact with Saavedra until later that morning after El Nuevo Rodeo had closed. As she was driving home after dropping off friends, Saavedra called her on her cell phone. Saavedra told Conejo-Cintura that he needed her help and implored her to come to his apartment across the river in

3

Swedesboro, New Jersey. She complied, and when she arrived at the apartment, she found Saavedra acting in a "strange" manner, "mad" and "nervous." Saavedra left the area of the Swedesboro apartment without telling Conejo-Cintura what exactly it was that he needed, and she did not ask because, according to her, "when you ask [questions of Saavedra], he gets really upset and comes at people."

"[D]ays later" - the record does not say how many - Conejo-Cintura returned to Saavedra's Swedesboro apartment at Saavedra's request, but he was not there—nor was his bed, furniture, or living room table. The apartment was otherwise in disarray with "a lot of stuff ... and boxes open everywhere." This surprised Conejo-Cintura, because she always knew Saavedra to keep a clean, orderly, and well-furnished apartment.

The next time Conejo-Cintura saw Saavedra was at her home in Delaware. After asking Conejo-Cintura if she had heard any rumors about what happened that night at El Nuevo Rodeo, Saavedra once again asked for help, saying that he needed to buy a car so he could leave the country. Conejo-Cintura, fearful that Saavedra would do harm to her—he "threatened [her] with death" - answered Saavedra's demands by helping find a car and signing for the loan.

Several days later—once again, we are not certain how many—Saavedra returned to Conejo-Cintura's house, this time in the car she had purchased for him. And on this occasion, Saavedra told Conejo-Cintura what happened "on the night of the rodeo." Saavedra confessed:

> [t]hat he got possessed by the devil and killed somebody that night and he didn't want to do it, and that he was going to finish the rest of the rats, the Guatemalans that he doesn't like.

Saavedra also told Conejo-Cintura that, because she now knew what happened, if anything happened to him, she would be guilty too. Saavedra was arrested on May 5, 2017 and charged with murder in the first degree and possession of a deadly weapon—the Cadillac Escalade—during the commission of a felony.

At his trial, the evidence was overwhelming—and Saavedra did not appear to contest—that he was the instigator of the dance-floor scuffle. And surveillance video clips, collected from numerous camera angles, captured—with varying degrees of clarity—much of what occurred after the two contending groups were expelled from the club.

In the State's opening statement, the prosecutor played some of the video clips for the jury and identified Lester Mateo and Elder

4

Saavedra, among others, from the time they left the club to the moment of the fatal collision. During this display, after specifically pointing out Saavedra, the prosecutor invited the jury to "watch ... and track the defendant." Saavedra did not object. The prosecutor also played a video showing Madelyn Aramiz walking to her van shortly before the collision and described her identification of Saavedra in the photographic lineup.

For his part, Saavedra's opening statement was short (covering five transcript pages) and relatively benign. He did, however, remind the jury that, despite the prosecutor's identification of Saavedra in the video clips during opening statements, whether that identification was accurate was for the jury to decide. Saavedra also suggested that Madelyn Aramiz's identification was unreliable.

The jury heard the testimony of fourteen witnesses, all of whom were called by the State. Saavedra chose not to present any evidence. Not surprisingly, one of the major thrusts of Saavedra's closing argument was an attack on Aramiz's credibility. But notably— especially in light of Saavedra's arguments before us—Saavedra paid scant attention in closing to the video evidence and whether it supported the State's contention that Saavedra was the driver who killed Mateo.[2]

## II.    PROCEDURAL HISTORY

On May 5, 2017, the Delaware State Police ("DSP") arrested Defendant for the March 26, 2017 murder of Mateo.[3]  On September 5, 2017, a New Castle County Grand Jury indicted Defendant for one count of Murder First Degree and one count of Possession of a Deadly Weapon During the Commission of a Felony.[4]    On September 19, 2018, a Superior Court jury convicted Defendant of both offenses,[5]

---

[2]  *Saavedra v. State*, 225 A.3d 364, 368-371 (Del. Jan. 30, 2020).
[3]  D.I. 55, 52:8 – 53:2.
[4]  D.I. 5.
[5]  D.I. 43.

and on March 22, 2019, this Court sentenced Defendant to life imprisonment without the possibility of probation or parole, plus ten years at Level V.[6]

On April 15, 2019, Defendant appealed his conviction to the Delaware Supreme Court.[7] In the direct appeal, Defendant argued (a) the prosecutor committed "prosecutorial misconduct by impermissibly eliciting the narration of the critical surveillance videotapes;"[8] (b) this Court "abused its discretion by allowing a police witness of Hispanic descent to testify regarding the meaning, beyond a literal translation, of the phrase 'la migra' – a phrase an eyewitness to the murder said she heard the Defendant utter as he fled the scene;"[9] and (c) the State "engaged in prosecutorial misconduct when the prosecutor asked a question of a recalcitrant witness implying the witness had previously identified Saavedra in a video, after the witness had denied doing so."[10] On January 30, 2020, the Delaware Supreme Court affirmed Defendant's convictions.[11]

---

[6] D.I. 53. On January 23, 2019, prior to the entry of judgment and imposition of sentence, Defendant filed an untimely Motion for Postconviction Relief. D.I. 47. On January 29, 2019, this Court summarily dismissed Defendant's first Motion for Postconviction Relief as untimely filed, D.I. 48, p. 2. To the extent Defendant did not raise claims from the untimely filed Motion for Postconviction Relief (D.I. 47) in the current Motion (D.I. 69), those claims are waived.

[7] D.I. 56.

[8] *Saavedra*, 225 A.3d at 372.

[9] *Id.*

[10] *Id.*

[11] *Id.* at 387.

On March 5, 2020, Defendant filed a *pro se* Motion for the Appointment of Postconviction Counsel[12] and a *pro se* Motion for Postconviction Relief ("Motion").[13] Defendant raised two claims in the Motion. First, he argued trial counsel was ineffective for failing to hire an accident reconstruction expert "to reconstruct the accident scene events to show movant was not the cause of the victim's death."[14] Second, he claimed the State failed to establish he committed First Degree Murder, because an element of First Degree Murder is the commission of an intentional act, and the State failed to prove he intended to kill Mateo.[15]

On March 19, 2020, this Court entered an Order granting Defendant's request for appointment of postconviction counsel,[16] and on February 25, 2021, Christopher Koyste, Esquire ("Mr. Koyste") was confirmed as postconviction counsel of record.[17] On March 30, 2022, Mr. Koyste filed a Motion to Withdraw as Counsel Pursuant to Superior Court Criminal Rule ("Rule") 61(e)(6)[18] and a Memorandum in Support of Motion to Withdraw as Counsel ("Memorandum in Support of Motion to Withdraw"), reporting that "[a]fter undertaking a vigorous and critical analysis of

---

[12] D.I. 68.
[13] D.I. 69.
[14] *Id.* at 3.
[15] *Id.*
[16] D.I. 72.
[17] D.I. 78.
[18] D.I. 105.

the record and [Defendant's] proposed claims, [he] has found no meritorious issues of law to be raised."[19]

On September 22, 2023, the State filed its Response to Defendant's Motion for Postconviction Relief and Postconviction Counsel's Motion to Withdraw ("State's Response").[20] On September 29, 2023, Defendant filed a Joint Motion for Leave to Amend Defendant's Pending Motion for Postconviction Relief, to Strike the State's Response, and to Provide any Other Relief Appropriate Under the Circumstances ("Motion for Leave to Amend").[21] Defendant's Motion for Leave to Amend was denied on November 7, 2023, and this Court advised Defendant that any response to postconviction counsel's Motion to Withdraw was not an opportunity to amend or submit additional postconviction claims.[22] Against this instruction, on December 4, 2023, Defendant filed a ninety-one page Response to Counsel's Motion to Withdraw ("Defendant's Response"), asserting nine additional postconviction claims.[23]

On July 23, 2024, Defendant filed a Supplement to Defendant's Response to Counsel's Motion to Withdraw,[24] wherein Defendant argued, in support of

---

[19] D.I. 107.
[20] D.I. 157.
[21] D.I. 160.
[22] D.I. 172.
[23] D.I. 174.
[24] D.I. 192.

Supplemental Claim Five, that a cellphone extraction report included information that he believed would have undermined Mariela Conejo-Cintura's testimony.[25]

On October 9, 2024, Mr. Koyste submitted a Response to Defendant's supplemental postconviction claims,[26] and on November 21, 2024, the State filed its Supplemental Response to Defendant's Motion for Postconviction Relief and Postconviction Counsel's Motion to Withdraw.[27] On March 19, 2025, Todd Henry, Esquire, filed an Affidavit responding to Defendant's ineffective assistance of counsel claims,[28] and on May 2, 2025, this Court received Defendant's Reply to Counsel's Affidavit.[29] Based on a review of the record, this is my decision on Defendant's Motion.

## III.   MOTION FOR POSTCONVICTION RELIEF

Defendant asserts trial counsel provided ineffective representation. In order to prevail on an ineffective assistance of counsel claim, a defendant must show: (1) "that counsel's representation fell below an objective standard of reasonableness," and (2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[30]  "The standard for

---

[25] *Id.*, p. 11-12.
[26] D.I. 201.
[27] D.I. 205.
[28] D.I. 211.
[29] D.I. 215.
[30] *Strickland v. Washington*, 466 U.S. 668, 694 (1984).

judging counsel's representation is a most deferential one,"[31] and there is a strong presumption that counsel's legal representation was competent and falls within the "wide range" of reasonable professional assistance.[32] Trial counsel "observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge."[33] As the Delaware Supreme Court explained in *Cooke v. State*:

> [p]roving that counsel's performance was objectively unreasonable 'has nothing to do with what the best lawyers would have done ... or even what most good lawyers would have done.' '[A] lawyer's performance is only constitutionally deficient if no competent attorney would have chosen the challenged course of action.' Where "an attorney makes a strategic choice after thorough investigation of law and facts relevant to plausible options," the presumption that an attorney acted reasonably is "virtually unchallengeable."[34]

The question for this Court is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom.[35] As such, mere allegations of ineffective assistance are insufficient. A defendant must make concrete allegations of ineffective assistance, and substantiate them, or risk summary dismissal.[36]

---

[31] *Premo v. Moore,* 562 U.S. 115, 122 (2011).

[32] *Id. at* 122-23; *see also Flamer v. State*, 585 A.2d 736, 753-44 (Del. 1990) (citations omitted).

[33] *Id.*

[34] *Cooke v. State*, 2025 WL 16395 at *24 (Del. Jan. 2, 2025) (internal citations omitted).

[35] *Id.* (citing *Strickland*, 466 U.S. at 690).

[36] *Younger v. State*, 580 A.2d 552, 556 (Del. 1990).

10

Deference is given to defense counsel's judgment to promote stability in the process.[37]

To overcome the strong presumption that trial counsel provided competent representation, a defendant must demonstrate that "counsel failed to act reasonabl[y] considering all the circumstances" and that the alleged unreasonable performance prejudiced the defense.[38] The essential question is whether counsel made mistakes so crucial that they were not functioning at the level guaranteed by the Sixth Amendment, thereby depriving defendant of a fair trial.[39]

Because a defendant must prove both parts of an ineffectiveness claim, this Court may dispose of a claim by first determining that the defendant cannot establish prejudice.[40] The first consideration in the "prejudice" analysis "requires more than a showing of theoretical possibility that the outcome was affected."[41] "It is not enough to 'show that the errors had some conceivable effect on the outcome of the proceeding.'"[42] Defendant must show a reasonable probability of a different result (*i.e.*, acquittal) but for trial counsel's alleged errors.[43]

---

[37] *State v. Fithian,* 2016 WL 3131442 at * 3 (Del. Super. May 25, 2016) (citing *Premo*, 562 U.S. at 120-122).
[38] *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (quoting *Strickland*, 466 U.S. at 688).
[39] *Id.*
[40] *Strickland,* 466 U.S. at 697.
[41] *Frey v. Fulcomer*, 974 F.2d 348, 358 (3rd Cir. 1992).
[42] *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (quoting *Strickland*, 466 U.S. at 693).
[43] *Strickland*, 466 U.S. at 695.

## IV. THE PARTIES' CONTENTIONS

### A. Defendant's postconviction claims.

As discussed *supra*, Defendant's September 23, 2022 Motion raised two claims. First, he argued trial counsel should have retained an accident reconstruction expert "to show movant was not the cause of the victim's death."[44] Second, Defendant asserted the State did not prove he committed Murder First Degree, *i.e.*, that he "intended to kill the victim."[45]

On December 7, 2023, this Court received Defendant's Response, where he raised nine additional postconviction claims.[46] These claims include: (1) trial counsel was ineffective for stipulating to the manner of the victim's death;[47] (2) trial counsel was ineffective for failing to "effectively challenge the State's improper use of testimonial hearsay evidence" which he alleges was used to "bolster Detective Mauchin's improper identification of Defendant;"[48] (3) trial counsel failed "to properly object to the inadmissible in-court identification of Defendant by Detective Mauchin on numerous occasions during the playing of video footage" recovered from the venue;[49] (4) trial counsel failed to "effectively impeach Madelyn Aramiz's inconsistent statements against credible video footage and conflicting statements

---

[44] *Id.*, p. 3.
[45] *Id.*
[46] D.I. 174.
[47] *Id.*, p. 9-19.
[48] *Id.*, p. 20-27.
[49] *Id.*, p. 27-39.

from other witnesses;"[50] (5) trial counsel failed to "effectively impeach Mariela Conejo-Cintura;"[51] (6) trial counsel failed "to contest the motive evidence presented by the State;"[52] (7) trial counsel failed to "effectively investigate the State's evidence against Defendant prior to trial;"[53] (8) trial counsel presented a deficient closing argument;[54] and (9) trial counsel committed "cumulative error."[55]

## B. Trial Counsel's Affidavit

On March 19, 2025, trial counsel's filed an affidavit in response to Defendant's postconviction claims ("Affidavit").[56] Trial counsel vehemently denied all of Defendant's postconviction allegations of ineffective assistance of counsel and explained that he and Defendant had an agreed upon strategy to achieve acquittal on all charges.[57] To accomplish that objective, he attacked the State's evidence which purportedly identified Defendant as the driver of the Escalade that pursued and rammed into Mateo, causing catastrophic internal injuries and death.[58]

The record reflects, and trial counsel's Affidavit confirms, Defendant met with trial counsel several times to discuss the State's plea offer.[59] The plea offer was

---

[50] *Id.*, p. 39-53.
[51] *Id.*, p. 53-62.
[52] *Id.*, p. 62-68.
[53] *Id.*, p. 68-80.
[54] *Id.*, p. 80-83.
[55] *Id.*, p. 83-89.
[56] D.I. 211.
[57] D.I. 69; D.I. 174.
[58] D.I. 211, p. 2.
[59] D.I. 76, 2:22 – 3:4.

to two offenses: Murder Second Degree and PDWDCF,[60] and the State agreed to recommend an aggregate prison sentence of twenty years.[61] Defendant was advised of the penalties for the indicted offenses as well as the offenses incorporated in the plea.[62] Defendant and trial counsel reviewed the facts of the case, the facts the State would likely present at trial, and any defenses.[63] And, when Defendant rejected the plea offer, he told this Court he had no questions for trial counsel about the case against him or the plea.[64] The decision to reject the plea and proceed to trial was Defendant's, and one he made of his own free will.[65] Defendant's rejection of the plea offer was knowing and intelligent.[66]

Trial counsel asserts the strategic decision to challenge the veracity or admissibility of certain evidence was "consistent with the agreed-upon trial strategy between the defendant and trial counsel."[67] Finally, trial counsel contends that while Defendant raised allegations of ineffective assistance of counsel, he failed to substantiate them.[68]

---

[60] *Id.* at 4:11-20.
[61] *Id.* at 6:8-14.
[62] *Id.* at 5:6 – 6:14.
[63] *Id.* at 6:18-23.
[64] *Id.* at 7:1-5.
[65] *Id.* at 8:1-4.
[66] *Id.* at 9:20-22.
[67] D.I. 211, p. 6.
[68] In Defendant's Reply to Counsel's Affidavit, Defendant argues trial counsel "concocted" the "all or nothing" defense strategy. D.I. 215, ¶ 2. But Defendant failed to substantiate this argument with any alternative strategy or support this claim with competent evidence. For example, Defendant argues "[c]ontrary to counsel's allegation, the record clearly indicates that trial counsel's purported 'all or nothing' defense strategy contemplated nothing more than the Murder

14

## C. Postconviction Counsel's Response.

On March 30, 2022, Mr. Koyste submitted a Memorandum in Support of Motion to Withdraw.[69] After conducting a thorough review of the record, Mr. Koyste concluded there were no meritorious claims which could be ethically advocated on Defendant's behalf.[70]

Upon reviewing the potentially applicable procedural bars set forth in Rule 61(i), Mr. Koyste concluded two claims were procedurally barred pursuant to Rule 61(i)(3) (Claim two)[71] and Rule 61(i)(4) (Claim five).[72]

Mr. Koyste also considered each of Defendant's claims and determined they were meritless. He agreed that if evidence of an alternative cause of death was presented to the jury, that would have been inconsistent with the goal of an all-out acquittal.[73] Mr. Koyste also concluded the State produced "ample evidence" of

---

Second Degree charge that was offered to him. Counsel conflates the significance of Saavedra's decision not to pursue a lesser-included Murder Second Degree charge as a decision not to pursue any and all other possible outcomes." D.I. 215 at ¶ 1. But the record is clear. Defendant has not identified any record evidence that he was amenable to any outcome other than an all-or-nothing acquittal. He rejected the State's plea offer, and he refused to request this Court instruct the jury on lesser included offenses. D.I. 76 (rejection of plea); *also see* D.I. 55, 69:1 – 70: 10 (rejection of lesser-included-offense jury instruction). Within this framework, there are only two trial outcomes: guilty or not guilty. There is no other possible outcome.

[69] D.I. 107.

[70] *Id.*, p. 1.

[71] *Id.*, p. 11-12.

[72] D.I. 201, p. 10-11.

[73] Mr. Koyste concluded, upon his review of the record, "that the ultimate objective was for Mr. Saavedra to be acquitted of all charges and the record [was] replete with examples of trial counsel acting consistent with that objective." *Id.*, p. 10.

15

intent to kill the victim.[74] In reviewing Defendant's nine supplemental postconviction claims,[75] Mr. Koyste concluded trial counsel's strategic decisions were consistent with the all-or-nothing strategy of acquittal on all charges. Mr. Koyste recognized that under Delaware law, the authority to manage the day-to-day conduct of the defense, including tactical decisions, rested with trial counsel, and trial counsel was not required to consult with Defendant regarding every tactical decision.[76] Finally, while Mr. Koyste may have concluded Defendant was entitled to a lesser-included offense instruction for Murder Second Degree, Defendant knowingly and voluntarily waived this opportunity during the post-prayer conference colloquy.[77]

Based on the overwhelming evidence of Defendant's guilt, Mr. Koyste concluded there was no reasonable probability of a different outcome if trial counsel performed differently.[78] Trial counsel maintained fidelity to Defendant's objective of an all-or-nothing verdict of not-guilty; meaningfully tested the State's evidence

---

[74] *Id.*, p. 13.

[75] *Id*.

[76] D.I. 201, p. 2-3, *citing Zimmerman v. State*, 2010 WL 546971, at *2 (Del. Feb. 16, 2010) (*quoting Cooke v. State*, 977 A.2d 803, 840-41(Del. 2009) (internal citations omitted) ("[t]he authority to manage the day-to-day conduct of the defense rests with the attorney. Specifically, defense counsel "has the immediate and ultimate responsibility of deciding if and when to object, which witnesses, if any, to call, and what defenses to develop. . . . [d]efense counsel's duty to consult with the defendant regarding "important decisions" does not require counsel to obtain the defendant's consent to "every tactical decision."))

[77] *Id.*, p. 16.

[78] *Id.*, p. 16-18.

proving Saavedra drove the Escalade into Mateo; attacked the credibility of witnesses; and vociferously advocated in closing argument that the State did not meet its burden of proof beyond a reasonable doubt. Mr. Koyste concluded Defendant's supplemental claims were meritless, Defendant failed to substantiate his claims with record evidence, and Defendant could not demonstrate prejudice.[79]

### D. State's Response to Defendant's Postconviction Motion

As noted *supra*, on September 22, 2023, this Court received the State's Response.[80] The State observed that Defendant's litigation strategy was "to achieve a verdict of not guilty at trial."[81] Defendant rejected the State's plea offer and waived a lesser-included offense jury instruction for Murder Second Degree.[82]

On November 21, 2024, the State filed a Supplemental Response to Defendant's Motion for Postconviction Relief and Postconviction Counsel's Motion to Withdraw ("State's Supplemental Response").[83] Therein, the State argued Defendant's supplemental claims were procedurally barred as untimely filed, as this Court denied Defendant's Motion for Leave to Amend,[84] and Defendant's Response (which included Defendant's nine supplemental claims) was filed more than one

---

[79] D.I. 201, p. 23-31.
[80] D.I. 157.
[81] *Id.*, ¶ 10.
[82] *Id.*, ¶¶ 21, 23.
[83] D.I. 205.
[84] D.I. 160.

year after the Delaware Supreme Court issued its mandate.[85]  Because Defendant's

supplemental claims are procedurally barred as untimely filed, and Defendant did

satisfy the exception to the Rule 61(i)(1)'s procedural bar (as provided in Rule

61(i)(5)), those claims are subject to summary dismissal.

Finally, after conducting a review of the Defendant's postconviction claims,

the State contends none are meritorious.  Defendant failed to demonstrate deficient

performance under *Strickland*;[86] and he did not establish prejudice.[87]

## V.    DISCUSSION

Superior Court Criminal Rule 61 provides an individual with a limited

opportunity to seek postconviction relief.[88]  Postconviction relief is intended "to

correct errors in the trial process, not to allow defendants unlimited opportunities to

relitigate their convictions."[89]  Before considering the merits of any postconviction

relief motion, this Court must apply Rule 61's procedural bars.  A motion for

postconviction relief can be procedurally barred as untimely, repetitive, formerly

adjudicated, or procedurally defaulted.[90]  The bars to relief do not apply to claims

that this Court lacked jurisdiction, or a claim that is pled with particularity that new

---

[85]  D.I. 205, ¶ 33.
[86]  *Id.*, ¶ ¶ 44, 52, 65, 76-77, 83, 87-90, 101, 105.
[87]  *Id.*, ¶ ¶ 45, 52, 68, 78, 84, 91-93, 103, 107.
[88]  *State v. Washington*, 2021 WL 5232259, at *4 (Del. Super. Nov. 9, 2021), *aff'd, Washington v. State,* 275 A.3d 1258 (Del. 2022).
[89]  *Ploof v. State*, 75 A.3d 811, 820 (Del. 2013).
[90]  *Washington*, 2021 WL 5232259, at *4.

18

evidence exists which creates a strong inference that the movant is actually innocent in fact of the acts underlying the charges of which he was convicted, or that a new rule of constitutional law, made retroactive to cases on collateral review by the United States Supreme Court or the Delaware Supreme Court, applies to movant's case and renders the conviction invalid.[91]

## A.  Procedural Requirements of Rule 61

In considering a motion for postconviction relief, this Court must first determine whether a defendant has satisfied the procedural requirements Rule 61(i) before considering the merit(s) of the underlying claims.[92]

Rule 61(i)(1) prohibits the Court from considering a motion for postconviction relief unless it is filed within one year after the judgment of conviction is final.[93]  And, as is the case here, when a defendant files a direct appeal, the judgment of conviction is final when the Delaware Supreme Court issues its mandate.[94]  If a defendant files an untimely motion, it may not be procedurally barred

---

[91] *See* Super. Ct. Crim. R. 61(d)(2).   Defendant has not met the pleading requirements for either exception noted in Rule 61(d)(2).

[92] *Taylor v. State*, 32 A.3d 374, 388 (Del. 2011) (quoting *Shelton v. State,* 744 A.2d 465, 474 (Del. 1999)).

[93] Super. Ct. Crim. R. 61(i)(1). A judgment of conviction is final "when the Supreme Court issues a mandate or order finally determining the case on direct review."  *State v. Drake*, 2008 WL 5264880, at *1 (Del. Super. Dec. 15, 2008).  Rule 61(i)(1) also affords a Defendant an opportunity to present a motion which "asserts a retroactively applicable right that is newly recognized after the judgment of conviction is final, more than one year after the right is first recognized by the Supreme Court of Delaware or by the United States Supreme Court."  *Id.*  Because Defendant has not claimed a newly recognized retroactively applicable right applies to Defendant's supplemental postconviction motion (D.I. 174), this exception is inapplicable.

[94] Super. Ct. Crim. R. 61(m)(1)(ii).

if a defendant asserts a "retroactively applicable right that is newly recognized after the judgment of conviction is final, more than one year after that right is first recognized by the Supreme Court of Delaware or by the United States Supreme Court."[95]

Rule 61(i)(2) prohibits the filing of repetitive motions for postconviction relief, unless: under Rule 61(d)(2)(i), the movant "pleads with particularity that new evidence exists that creates a strong inference" of actual innocence; or, under Rule 61(d)(2)(ii), "that a new rule of constitutional law, made retroactive to cases on collateral review," applies to the movant's case.[96]

Rule 61(i)(3) provides that "any ground for relief that was not asserted in the proceedings leading to the judgment of conviction, as required by the rules of this Court, is thereafter barred, unless the movant shows (a) cause for relief from the procedural default and (b) prejudice from the violation of movant's rights."[97]

Rule 61(i)(4) provides that "[a]ny ground for relief that was formerly adjudicated, whether in the proceedings leading to the judgment of conviction, in an appeal, in a postconviction proceeding, or in a federal habeas corpus proceeding, is thereafter barred."[98]

---

[95] Super. Ct. Crim. R. 61(i)(1). Defendant failed to assert a retroactively applicable right in the Motion, so the exception provided in Rule 61(i)(1) is inapplicable here.
[96] Super. Ct. Crim. R. 61(i)(2).
[97] Super. Ct. Crim. R. 61(i)(3).
[98] Super. Ct. Crim. R. 61(i)(4).

Rule 61(i)(5) provides that the procedural bars provided in Rules 61(i)(1)-(4) do not apply to a claim that the Court lacked jurisdiction or if the Defendant satisfies the pleading requirements of Rule 61(d)(2)(i) or (d)(2)(ii).[99]

### 1. **Application of Procedural Bars**

As to Rule 61(i)(1)'s timeliness bar, the Delaware Supreme Court issued its mandate on February 25, 2020,[100] therefore Defendant's March 5, 2020 Motion was timely filed.[101] But, the State argues Defendant's December 7, 2023 attempt to amend the Motion with nine additional claims was untimely under the Rule because an amendment to the Motion was not authorized by this Court, and the supplemental claims included in Defendant's Response were filed more than one year after the judgment of conviction became final.

Pursuant to Rule 61(b)(6), a postconviction motion may be amended "at any time before a response is filed or thereafter by leave of the court…."[102] The docket reflects that on September 22, 2023, this Court received the State's Response.[103] Defendant did not attempt to amend the Motion prior to September 22, 2023, so any attempt to do so after that date, without leave of this Court, would be untimely and

---

[99] Super. Ct. Crim. R. 61(i)(5). Defendant has not raised a jurisdictional argument.
[100] D.I. 67. *See* Super. Ct. Crim. R. 61(m)(1)(ii): "A judgment of conviction is final for the purpose of this Rule . . . (ii) if the Defendant files a direct appeal or there is an automatic statutory review of a death penalty, when the Supreme Court issues its mandate or order finally determining the case on direct review."
[101] D.I. 69.
[102] Super. Ct. Crim. R. 61(b)(6).
[103] D.I. 157.

violate the plain language of the Rule. One week later, on September 29, 2023, Defendant submitted a Motion for Leave to Amend.[104] This Court denied the Motion for Leave to Amend on November 7, 2023 and explicitly advised Defendant that any response to postconviction counsel's motion to withdraw was "not an opportunity to amend [his] claims or present additional postconviction claims."[105] Despite this Court's Order, on December 7, 2023 Defendant filed Defendant's Response[106] and an accompanying Memorandum of Law in Support of Defendant's Response to Counsel's Motion to Withdraw, asserting nine additional postconviction claims. As the December 7, 2023 filing was received more than one year after the Delaware Supreme Court issued its mandate, the State's Response had been filed, and Defendant's leave to amend was denied, Defendant is time-barred from amending the Motion. All nine supplemental claims raised in Defendant's Response are procedurally barred as untimely filed pursuant to Rule 61(i)(1).[107]

Additionally, Defendant's second claim in the Motion (that the State failed to prove he intended to kill Mateo) is procedurally barred pursuant to Rule 61(i)(3), as Defendant failed to assert this claim in the proceedings leading to the judgment of

---

[104] D.I. 160.
[105] D.I. 172.
[106] D.I. 174.
[107] *See State v. Smith*, 2023 WL 4102774, at *3 (Del. Super. June 20, 2023), *aff'd Smith v. State*, 2023 WL 8596388, at *1 (Del. Dec. 11, 2023) (Defendant's supplemental claims were time-barred pursuant to Rule 61(i)(1) because they were filed after this Court received the State's Response to the Rule 61 Motion, and Defendant did not receive leave of court to amend the motion.)

conviction, and he did not establish cause for the procedural default or prejudice from the violation of his rights.[108]

Finally, with respect to the third postconviction claim in Defendant's Response (that trial counsel was ineffective for permitting Detective Mauchin to identify Defendant from video surveillance video footage before counsel finally objected to Detective Mauchin's sixth identification of Defendant within the video footage),[109] this claim is procedurally barred as previously adjudicated pursuant to Rule 61(i)(4). Defendant has simply re-stated the first claim raised on direct appeal, which the Delaware Supreme Court denied.[110] The Defendant could have avoided the applicability of the procedural bars in Rule 61(i)(1)-(4) if he presented valid claims (1) asserting that the Court lacked jurisdiction or (2) pled with particularity that (a) new evidence exists that creates a strong inference that Defendant is innocent in fact of the charged offenses, or that (b) a new rule of constitutional law made retroactive on cases on collateral review by the United States Supreme Court or the Delaware Supreme Court applies to his case and makes his conviction invalid, but he did not do so.[111]

---

[108] D.I. 69, p. 3, Claim Two.
[109] D.I. 174, p. 27.
[110] *See Saavedra*, 225 A.3d at 373-381; *Also see Skinner v. State*, 607 A.2d 1170, 1173 (Del. 1992) ("A defendant is not entitled to have a court reexamine an issue that has been previously resolved 'simply because the claim has been refined or restated.'")
[111] *See* Super. Ct. Crim. R. 61(d)(2).

Even though all but one of Defendant's claims are procedurally barred, the relative merit of Defendant's claims will be addressed below.

### 2. Consideration of Defendant's Claims

Defendant has raised eleven postconviction claims. Each claim will be addressed in the order it was presented.

**a. Trial counsel was ineffective for failing to hire an accident reconstruction expert to reconstruct the accident scene events to show movant was not the cause of the victim's death.[112]**

Defendant contends trial counsel should have retained an accident reconstruction expert to show he was not the cause of Mateo's death. But, Defendant has not identified an accident reconstruction expert who would testify favorably on his behalf, and he has not provided this Court a report from an accident reconstruction expert which opines Defendant was not the cause of Mateo's death. Defendant has also failed to identify any other record evidence which an accident reconstruction expert would rely upon in offering an opinion that Defendant was not the cause of Mateo's death. It is Defendant's burden to substantiate this postconviction claim, and he has failed to do so. Moreover, Delaware case law provides "the decision not to hire an expert is a strategic one, and after investigation of the facts and law, it is virtually unchallengeable."[113]

---

[112] D.I. 69, p. 3.
[113] *State v. Appiah*, 2023 WL 5608927, at *12 (Del. Super. Aug. 28, 2023).

Defendant has also failed to demonstrate calling an accident reconstruction expert would have negatively impacted the State's case or advanced a viable defense.[114] Given that Defendant's ultimate goal was a not guilty verdict, trial counsel's decision not to call an accident reconstruction expert, or other expert, to contest the cause of Mateo's death, without conceding Defendant was the driver of the Escalade, was consistent with Defendant's agreed upon defense, reasonable, and within the wide range of appropriate professional conduct.

The surveillance video showed Mateo being pursued and violently struck by the Escalade, just after he had tripped/fallen in the parking lot. The issue for the jury was who drove the Escalade into Mateo and killed him. The State's evidence of the "cause" of Mateo's death was overwhelming, as Mateo's fate was sealed the moment the Escalade struck him and caused catastrophic internal injuries.[115] The only question for the jury was the identity of the driver, and Defendant has failed to show how calling an accident reconstruction expert would have assisted the defense. Defendant has failed to demonstrate trial counsel's representation was objectively unreasonable, and there is no reasonable probability that counsel's strategic decision not to call an accident reconstruction expert would have resulted in an acquittal.[116]

---

[114] *See generally Sierra v. State*, 254 A.3d 563, 574 (Del. 2020).

[115] *See* State's Ex. 19, Medical Examiner's Report.

[116] *Strickland*, 466 U.S. at 688-694. Additionally, as noted by postconviction counsel, retaining an accident reconstruction expert and eliciting testimony that the victim's cause of death was not a result of Defendant's operation of the Escalade when it initially collided with the victim, but a subsequent operator, would have been in direct conflict with the agreed upon trial strategy. Trial

**b. Defendant's conviction for First Degree Murder (intentional) must be vacated because the State failed to establish he intended to kill the victim.**[117]

Defendant argues the State failed to prove the murder of Mateo was an intentional act.[118] An intentional act is one where the evidence demonstrates it was a defendant's conscious objective or purpose to cause a specific result, here being Mateo's death.[119]

Trial counsel interpreted Defendant's argument as a failure to move for judgment of acquittal on Murder First Degree.[120] In that vain, a motion for judgment of acquittal would have been baseless and pointless.[121]

To the extent Defendant argues the jury could not have found he committed an intentional act, this Court correctly instructed the jury on the element of intent for Murder First Degree,[122] and juries are presumed to follow the court's instructions.[123] The jury was also instructed on a Defendant's "State of Mind" as an element of a

---

counsel was not ineffective for failing to take actions which would have undermined the agreed-upon trial strategy. D.I. 107, p. 11.

[117] D.I. 69, p. 3.

[118] *Id.*

[119] *See* 11 *Del. C.* § 231(b)(1).

[120] D.I. 211, p. 3.

[121] With respect to a motion for judgment of acquittal, this Court's legal analysis is "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of a crime beyond a reasonable doubt." D.I. 211, *quoting Jackson v. Virginia*, 447 U.S. 307, 319 (1979) (internal citations omitted).

[122] D.I. 55, 131:16 – 22.

[123] *Phillips v. State*, 154 A.3d 1146, 1154 (Del. 2017) (*citing Revel v. State*, 956 A.2d 23, 27 (Del. 2008)).

criminal offense, which set forth how the jury could consider the evidence when determining Defendant's intent. This Court instructed the jury as follows:

> An element of a criminal offense deals with the state of mind of the Defendant. It is, of course, difficult to know what is going on in another person's mind. Therefore, you are permitted to draw an inference, or in other words reach a conclusion, about the Defendant's state of mind from the facts and circumstances surrounding the act that the Defendant is alleged to have committed. In reaching this conclusion, you may consider whether a reasonable person acting in the Defendant's circumstances would have had or lacked the requisite knowledge or intention. You should, however, keep in mind at all times that it is the Defendant's state of mind that is at issue, and in order to convict the Defendant you are required to find beyond a reasonable doubt that the Defendant in fact had the knowledge or intention required for a finding of guilt.
> The fact that our law permits you to draw an inference about a Defendant's state of mind in no way relieves the State of its burden of proving beyond a reasonable doubt every element of an offense.[124]

Direct evidence of intent is not necessary to establish guilt beyond a reasonable doubt; guilt can be established by circumstantial evidence alone.[125] The record facts, direct and circumstantial, amply supported the jury's verdict, and the State presented overwhelming evidence of Defendant's guilt. Evidence which likely contributed to the jury's consideration of Defendant's intent includes the following: three witnesses, Irvin Ramirez-Recinos, Yosimar de Leon Lopez, and Fernando Castillo de Leon, described a confrontation between the Defendant and the victim and/or the victim's associates in the El Nuevo Rodeo, where the Defendant

---

[124] D.I. 55, 134:1 – 135:2.
[125] *Morales v. State*, 696 A.2d 390, 394 (Del. 1997).

threatened the victim and/or his friends.[126] The surveillance video from the El Nuevo Rodeo shows an Escalade being driven in a reckless manner in pursuit of Mateo and running directly into him, even though it had time, space and distance to avoid a collision. Madelyn Aramiz, who was feet away from the collision, described the Escalade *accelerating into* Mateo,[127] and she identified Defendant as the driver.[128] The Medical Examiner's report documents Mateo's catastrophic injuries as a result of the motor vehicle collision.[129] The Escalade's crash recorder data indicated the driver of the Escalade accelerated, as opposed to braked, as it pursued Mateo at the time of the collision, and the brake was not activated until one second before the vehicle struck the building, which was at or after Mateo was struck. Mariella Conejo-Cintura told the jury that after the events at the El Nuevo Rodeo, Defendant told her "he got possessed by the devil and killed somebody that night and he didn't want to do it, and that he was going to finish the rest of the rats, the Guatemalans he doesn't like."[130] After the homicide, the Defendant's phone records suggest he immediately fled to North Carolina and then later to New York City.[131] Defendant then adopted an alias, moved out of his New Jersey apartment, convinced Mariela

---

[126] D.I. 60, 68:1 – 21; 97:23 – 111:12; 114:18 – 117:14.
[127] D.I. 60, 162:11 – 163:15.
[128] D.I. 60, 169:12 – 171:2.
[129] State's Ex. 19.
[130] D.I. 66, 146:19 – 23.
[131] This Court also provided a "flight" instruction, informing the jury that flight after a crime can be considered evidence of a defendant's "consciousness of guilt or Defendant's identity as the person who committed the offense." D.I. 55, 140:1 – 6.

Conejo-Cintura to buy a Toyota 4Runner in her name for his use, stopped showing up to a job he held for more than three years, failed to collect two final paychecks from his former employer, and the police recovered a shirt among his packed up possessions which appeared identical to the one he wore on the night of the murder. Defendant's argument that the State failed to establish he intended to murder the victim is unsupported by the record and meritless.

c. **Defendant's rights under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article 1, Section 7 of the Delaware Constitution were violated by trial counsel's ineffective representation in stipulating to the manner of Mateo's death.** [132]

Defendant asserts trial counsel was ineffective for stipulating to the cause of Mateo's death. Defendant asserts counsel made this decision "so the State could avoid the cost of the medical examiner testifying."[133] Defendant speculates that "evidence existed within the record suggesting that the cause of death in this case is not as clear-cut as the State would have us believe."[134] Defendant hypothesizes that the "medical examiner expressed some hesitation" in making an official determination in this matter, "given the manner of injuries sustained by Mateo."[135] Defendant extrapolates his theory that the Medical Examiner was hesitant in making

---

[132] D.I. 174, p. 9.
[133] *Id.* The Defendant has failed to identify any record evidence supporting this claim, and there is none. The Medical Examiner is an employee of the State of Delaware Division of Forensic Science.
[134] *Id.*, p. 10.
[135] *Id.*

a determination as to cause of death "from an appearance that Mateo's injuries were consistent with having been ran over multiple times."[136] Defendant claims the record evidence proves "Mateo can be seen, still moving, after being struck by the Escalade," and these movements "did not cease until after one of Mateo's compatriots (Fernando, in all likelihood) re-entered the escalade and backed up over Mateo in an ill-conceived attempt to drive off."[137] Defendant then theorizes that "[w]itness testimony also supports this line of thought,"[138] arguing his "alternative theory . . . would have primarily established reasonable doubt as to Defendant's guilt while also pointing the blame toward another party."[139]

Defendant contends that due to trial counsel's faulty trial strategy, an alternative theory to the State's claim that "the original collision was the cause of Mateo's death" could not be asserted.[140] Defendant argues that stipulating to a "crucial fact in the State's case that was disputed by the very evidence presented by the State at trial was objectively reasonable conduct that resulted in substantial prejudice to Defendant."[141]

Defendant's theory of an alternative cause of death is limited by the record, and reasonable inferences derived from the record, and he has failed to cite to *any*

---

[136] *Id.* The record is devoid of any evidence that Mateo had been "ran over several times."
[137] *Id.*
[138] *Id.*
[139] *Id.*
[140] *Id.*, p. 11.
[141] *Id.*

*record evidence* that supports his alternative version as to how Mateo was critically injured, or that he was prejudiced by counsel's stipulation regarding the cause of death. While Defendant claims Mateo "moved" after being struck by the Escalade, the surveillance video shows Mateo rolling over from his back to his chest immediately after initial vehicle impact, and no movement thereafter.[142] Mateo's body is between the Escalade and the car adjacent to it, the Escalade's left front tire is on the sidewalk, and the left rear tire is *not in the vicinity of* Mateo's torso. The surveillance video depicts the Escalade moved approximately six inches in reverse after Mateo was struck, and it did not move in any direction thereafter. There is no record evidence supporting Defendant's theory that the Escalade rolled over Mateo's body "multiple times."[143]

Stipulating to the cause of death was trial strategy, a decision left to trial counsel.[144] And here, trial counsel sought to challenge the State's ability to prove, beyond a reasonable doubt, that Defendant was the operator of the Escalade that critically injured Mateo. Trial counsel's decision acknowledged there was no arguable alternative cause of death which could have been presented to the jury, and focusing on the State's alleged inability to identify the driver was reasonable trial

---

[142] See State's Ex. 11.
[143] See State's Ex. 15.
[144] See *People v. Knowles*, 145 N.E.3d 436, 447-48 (Ill. Ct. App. (3d) Oct. 8, 2019) (Trial counsel's decision to stipulate to the cause of death "amounted to trial strategy.")

strategy. The Defendant has not supported this claim with an affidavit or report from any expert which substantiates an alternative cause of death. Stipulating to the cause of death also removed potentially inflammatory evidence of Mateo's injuries being presented to the jury through the testimony of the Medical Examiner. Defendant has not established counsel's strategy was objectively unreasonable, and this claim is factually unsubstantiated and meritless.

> **d. Defendant's rights were violated under the Fifth, Sixth and Fourteenth Amendments of the United States Constitution and Article I, Section 7 of the Delaware Constitution were violated by trial counsel's failure to effectively challenge the State's improper use of testimonial hearsay evidence to bolster Detective Mauchin's improper identification of Defendant.[145]**

Defendant next argues the State improperly bolstered the credibility of Detective Mauchin's testimony "as it related to Mauchin's definitive belief that Defendant was the perpetrator of the crimes at issue in this case."[146] Defendant argues that on the night of the murder, a photograph was shown to "non-testifying bystanders" and Madelyn Aramiz.[147] Defendant also asserts "[Madelyn] Aramiz was unable to identify the man in the photo as the driver."[148] Defendant alleges another "observer had provided and circulated a photograph of Defendant and that

---

[145] D.I. 174, p. 20.
[146] *Id.*
[147] *Id*.
[148] *Id*. There is no record evidence that law enforcement showed Madelyn Aramiz an image of the Defendant on the night/morning of the homicide.

other observer had asserted that Defendant was the driver of the Escalade,"[149] but this person was neither called to testify by the State nor made available to the defense for cross-examination prior to trial."[150] According to Defendant, testimony regarding this photograph "improperly bolstered [Detective] Mauchin's testimony generally, and also specifically bolstered his identifications of Defendant within camera footage that the jury would not have been able to independently identify Defendant from."[151] Defendant argues he was prejudiced by trial counsel's failure "to object to the use of such testimony because that testimony was objectionable."[152]

Trial counsel denies Defendant's claim. He asserts that when Detective Mauchin identified Defendant as the driver of the Escalade on the fourth day of trial, counsel successfully objected to Detective Mauchin's identification on a video clip, the objection was sustained, and the jury was instructed to disregard any identification testimony from the detective.[153] And, to the extent Defendant claims to have been prejudiced by the identification procedure, multiple witnesses and evidence identified Defendant as the operator of the Escalade: Madelyn Aramiz identified Defendant as the operator of the Escalade; Defendant's brother, Brian Saavedra, conveniently could not identify Defendant on the scene or as the driver of

---

[149] *Id.*, p. 20-21.
[150] *Id.*, p. 21.
[151] *Id.*
[152] *Id.*, p. 24.
[153] D.I. 211, p. 5.

the Escalade despite other witnesses having already done so; Mariela Conejo-Cintura recalled a post-homicide conversation with Defendant where he "confessed to killing someone and indicated he intended to finish off the rest of the Guatemalans;"[154] and the video surveillance evidence was extensive. Even excluding Detective Mauchin's identification testimony, there was "more than enough evidence . . . for the jury to conclude [Defendant] was the driver of the Escalade at the time of the [collision]."[155]

Defendant cannot demonstrate prejudice under *Strickland*, as he was identified as the driver of the Escalade by multiple sources. Defendant's claim as to the value of Detective Mauchin's identification is overstated, given the Court's instruction to disregard it, and the totality of the identification evidence (including but not limited to Defendant's admission that he killed Mateo) presented at trial.

**e. Defendant's rights under the Fifth, Sixth and Fourteenth Amendments of the United States Constitution and Article I, Section 7 of the Delaware Constitution were violated by trial counsel's failure to properly object to the inadmissible in-court identification of Defendant by Detective Mauchin on numerous occasions during the playing of video footage.[156]**

Defendant argues trial counsel was ineffective for "permitting Detective Mauchin to identify Defendant within unclear video surveillance footage on five

---

[154] D.I. 201, p. 9.
[155] *Id.*
[156] D.I. 174, p. 27.

different occasions before finally objecting to Mauchin's sixth identification of Defendant within the video footage."[157]  Defendant contends counsel's failure to raise "substantial enough questions regarding the identity of the Escalade's driver, the State's case would have been undermined."[158]  Defendant also argues postconviction counsel "negligently overlooked trial counsel's ineffective failure to object to Mauchin's impermissible identifications of Defendant within the video footage or erroneously determined that said claim lacked merit without stating such for the record."[159]

There is no record evidence suggesting anyone other than Defendant was the operator of the Escalade when it ran down Mateo.  The State's burden to prove the identification of the driver of the Escalade was raised in trial counsel's opening statement and throughout trial.  Four sentences into his opening statement, trial counsel told the jury:

> I also want to caution you, because we just saw a video where the State said the person in the video is [the Defendant.]  That's not the State's job, that's your job.  And you just took an oath saying you're going to uphold that job.  So it's for you to make those determinations.  No matter how many circles they draw, no matter how many times they say it's that person, that doesn't mean anything.  That's for each and every one of you to decide. . ..
> You are the factfinders.  It's your responsibility to hold the Government to their burden of proof, to weigh the evidence, and to decide whether

---

[157]  *Id.*
[158]  *Id.*, p. 28.
[159]  *Id.*, p. 29-30.

or not that evidence proves beyond a reasonable doubt this young man here was the driver of that car.[160]

When trial counsel's objection as to Detective Mauchin's identification of Defendant on the video recordings was sustained, this Court provided the following jury instruction:

Ladies and Gentlemen, you should – the factual issue of who gets into that vehicle, which person it is on the video, is up to you to determine in the course of this trial in your deliberations, and you should disregard any testimony from Detective Mauchin or any other witness who gets into the vehicle.[161]

During closing argument, this Court reminded the jury that it was the State's burden to identify the Defendant as the person who committed the crime. The jury was instructed as follows:

An issue in this case is the identification of the Defendant. To find the Defendant guilty, you must be satisfied, beyond a reasonable doubt, that the Defendant has been accurately identified, that the wrongful conduct charged in this case actually took place, and that the Defendant was in fact the person who committed the act. If there is any reasonable doubt about the identification of the Defendant, you must give the Defendant the benefit of the doubt and find the Defendant not guilty.[162]

The State presented overwhelming evidence that Defendant was the operator of the Escalade, independent of the surveillance video recordings wherein Detective Mauchin identified Defendant (which the jury was instructed to disregard). The jury

---

[160] D.I. 53, 38:7 – 16; 43:10 – 44:4.
[161] D.I. 55, 38:12 – 18.
[162] *Id.*, 139:11 – 22.

36

could view, during trial and while deliberating, all the evidence, and the jury was instructed to disregard Detective Mauchin's identification of Defendant. It was the jurors' sworn obligation to hold the State to its burden of proof and satisfy itself that Defendant was the operator of the Escalade. There is no evidence the jury failed to follow this Court's instructions or that it was unduly influenced by Detective Mauchin's testimony.[163] Defendant's claim is meritless, and he cannot establish prejudice.

**f. Defendant's rights under the Fifth, Sixth and Fourteenth Amendments of the United States Constitution and Article I, Section 7 of the Delaware Constitution were violated by trial counsel's failure to effectively impeach Madelyn Aramiz's inconsistent statements against credible video footage and conflicting statements from other witnesses presented by the State.[164]**

Defendant argues that trial counsel did not effectively cross-examine Madelyn Aramiz with evidence arguably inconsistent with her testimony. Defendant opines "there was substantial reason to believe that Aramiz was not credible," and her "description of the collision contained enough deficiencies that trial counsel should

---

[163] *See Guy v. State*, 913 A.2d 558, 565-66 (Del. 2006) ("Error can normally be cured by the use of a curative instruction to the jury, and jurors are presumed to follow those instructions.") *See also Cooke v. State*, 97 A.3d 513, 547 (Del. 2014) ("In any event, the admission of [the detective's] lay opinion testimony was harmless. As explained, the jury was required to and was instructed to make its own determination about this factual question, and there is no rational basis to believe that the jury did not do that here, or that the jury was somehow unduly influenced by [the detective's] brief testimony on this point. Furthermore, an error in admitting evidence may be deemed to be 'harmless' when 'the evidence exclusive of the improperly admitted evidence is sufficient to sustain a conviction.'")

[164] D.I. 174, p. 39.

have vigorously cross-examined her in an effort to offset the impact of her identification of Defendant as the driver of the Escalade."[165]

Trial counsel denies Defendant's claim, asserting the cross-examination of Madelyn Aramiz was "consistent with the agreed-upon trial strategy between the defendant and trial counsel."[166] In closing argument, he repeatedly told the jury Madelyn Aramiz "was not a credible witness and that her identification was suggestive."[167]

"Whether to call a witness, and how to cross-examine those who are called, are tactical decisions."[168] So long as a decision to cross examine a witness is made reasonably, it does not constitute a valid ineffective assistance of counsel claim.[169] As is explained below, trial counsel's cross examination was reasonable, and he was able to credibly argue during closing argument that Madelyn Aramiz's testimony was not believable.

Madelyn Aramiz arrived at the El Nuevo Rodeo with her cousins, and around 1:00 a.m., she tired and told her cousins she would wait for them in the van.[170] She

---

[165] *Id.*, p. 39 – 40.
[166] D.I. 211, p. 6.
[167] *Id.*
[168] *Shelton*, 744 A.2d at 479 (*quoting Outten v. State*, 720 A.2d 547, 557 (Del. 1998) (*citing United States v. Lively*, 817 F.Supp. 453, 462 (D.Del. 1993), *a'ffd* 14 F.3d 50 (3rd Cir. 1993), *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987) (decisions whether to cross-examine are strategic and do not constitute a basis for ineffective assistance of counsel)).
[169] *Id.*
[170] D.I. 60, 158:11 – 22.

38

then sat in the front passenger seat of the van.[171]  Soon thereafter, she believed a

truck in the parking lot "floored it" and ran right into Mateo.[172] She then described

what she saw next:

> I saw him jump out.  I saw him jump out of the driver's side.  And then he proceeded to run.  But he stood directly in front of the van I was sitting in pretty much.  And he stood there.  He had a belt wrapped around his hand with a big buckle. And he stood there for a few seconds. And then he kind of smirked and did a little hippity-hop. And then he said la migra.  And then he ran off.[173]

The State played Madelyn Aramiz's 911 call to the jury.[174] Madelyn Aramiz

was then asked about being shown a post-collision photo from someone at the El

Nuevo Rodeo, but she denied recognizing anyone in that photograph.[175]  During a

subsequent DSP interview, she identified the Defendant as the person who drove the

Escalade after selecting his photograph from a photo array.[176]  The Prosecutor then

played State's Exhibit 11, a surveillance video recording, and Madelyn reviewed the

Defendant's flight after exiting the Escalade.  In the video, the Defendant cannot be

seen, as Madelyn Aramiz testified, stopping in front of her car or doing a "hippity-

hop."   When the prosecutor asked about this discrepancy, Madelyn Aramiz

explained what was on the video was "not how she remembered it."[177]   Her

---

[171]  *Id.* at 160:13 – 18.
[172]  *Id*. at 162:14 – 163:6.
[173]  *Id*. at 164:15 – 22.
[174]  *Id*. at 165:22 – 166:10.
[175]  *Id*. at 168:3 – 8.
[176]  *Id*. at 168:22 – 171:2.
[177]  *Id*. at 171:11 – 17.

recollection was that Defendant screamed "la migra" after he paused in front of the van.[178]

On cross-examination, Madelyn Aramiz explained she went with her cousin to meet the victim's family at the hospital in the morning after the collision.[179] A week later, she received a Facebook message from one of Mateo's friends or a family member who provided details of Mateo's viewing.[180] According to Madelyn Aramiz, in describing the driver of the Escalade's conduct after the collision, she believed Defendant reached out the truck's window to open the door from the outside;[181] stopped in front of her car and said "La Migra"[182] twice, and ran off.[183] She described Defendant as appearing "stone-cold sober."[184]

In closing, trial counsel argued:

> So, there's one ID left, and that's Madelyn. With all due respect to her, she didn't see this. She did not see this happening. Somebody there told her what happened. And why is that? Because every single fact that she has is inconsistent with the video. And its inconsistent with the officer who gave the test, who did all the testing on where the car went.
> First of all, she says – she drew it, that the car didn't go over the grass. It drove on the street. She drew that on direct. We know that's not true, because there are tire tracks – tire tracts – excuse me, across the grass.

---

[178] *Id.* at 173:5 – 10.
[179] D.I. 66, 5:23 – 6:10.
[180] *Id.* at 7:15 – 8:2.
[181] *Id.* at 10:17 – 23.
[182] *Id.* at 11:1 – 13.
[183] *Id.*
[184] *Id.* at 13:5 – 6.

She said that the person who got hit was not Lester. She said there was someone walking, and you'll see it on the video. There's a young man that it walking between the cars where that car goes. She said he looks out, sees the car coming, turns around and runs. Somebody does that, she says, but he gets run over. That's not the young man who gets run over. So, she's wrong there.

She says that he – the driver of the car reaches his hand through the window and opens up the door – I think that's the only question I asked her – to let himself out. The video doesn't show that. In fact, I think the video shows the window is open. You see the door open. You don't see a hand go out.

She says that the person in the car who gets out has a belt wrapped around his hand. He doesn't. He gets out of the car. He doesn't.

She says – and she kind of stopped when she was watching the video on direct. They asked her: Is this what happened? She says the person stopped and yelled "la migra" two times. Stopped right in front of her. And as she was testifying, she said, and they played it – Oh, no, but I remember he stopped. And the video doesn't show him stopping.

And not one other witness said they heard him yell anything. And she's sitting in the van with the windows closed. You can see that. So, if he yelled it loud enough for her to hear in the van, how about the guy that said he heard the engine revving? He doesn't testify to hearing that.

But how do we know they fed it all to her? Because the day of, that morning, at the hospital they show her the picture. They say, well, this is the guy we had a fight with inside or a pushing match with. They showed her a picture. It's easy now for her. In her mind she's seen him for seconds until she sees the picture. She's looking at the picture and there saying: He's the guy we were having a problem with inside. All their belts around their hands, their wrists.

They would have yelled "La Migra," because in our neighborhood it means run. And probably touched the outside of the door. He reached his hand around. It's not plausible. It's not plausible.

So, what I'll say is that her statements, her version of these events, don't match anybody else's version of these events. They don't match the video.

A wise person once told me the way to tell if someone is telling the truth is if they repeat it the same way over and over again and are there intrinsic other pieces out there that match.

41

You have the other piece. You see the person get out of the car. They don't reach their hand through the window. They don't have their belt around their hand. You see them running right by the car, and they're not stopping, and it doesn't appear they're yelling anything. And anybody else at the scene who are the security guards do not say: Yeah, we heard "La Migra" being screamed.

And she said, Oh, I only heard it once. But it turned out when she talked to the police, she said she heard it twice. You draw your own conclusion on whether or not she saw what happened and whether or not the only identification of the driver, is not tainted, and it's him, after we know that she was shown a picture.

That's the evidence against Mr. Saavedra. That's the identity evidence. Does it make sense he would leave a car running without knowing who was going to get into the car where people are standing there? There's no evidence he knows Mr. Saavedra at all.

And the only eyewitness that they called to identify the driver who got out of the car has made those mistakes that I have pointed out to you. That's reasonable doubt. And reasonable doubt requires one verdict, and that is a verdict of not guilty.[185]

Defendant presumes the jury would have been persuaded that Madelyn Aramiz's identification was not credible if she was cross-examined with more vigor. Not so. The hallmark of effective cross-examination is to use facts from the evidence adduced at trial and present a cogent and compelling closing argument.[186] To provide one example, Defendant suggests Madelyn Aramiz should have been confronted with factual inconsistencies in her testimony – the Defendant did not appear to have

---

[185] D.I. 55, 113:21 – 119:4.

[186] In closing argument, trial counsel identified the following inconsistencies between Madelyn Aramiz's testimony and other trial evidence: the Escalade drove over the grass (Aramiz said it did not); the victim was misidentified on the 911 call; the driver of the Escalade did not reach through the window to open the door; the person exiting the Escalade did not have a belt wrapped around their hand(s); the driver did not stop in front of the van, do a hippity-hop, and was not observed yelling "La Migra" twice; the driver did not stop running away from the scene, and no other person testified that they heard the driver yell "La Migra."

his hand wrapped in a belt; the Defendant did not stop in front of her van and do a "hippity-hop;" and the Defendant did not scream "La Migra" twice. But instead of asking the witness about inconsistencies and giving her the opportunity to claim, "that's not how she remembered it," trial counsel contrasted her testimony with the objective evidence – the surveillance video recording. The jury listened to Madelyn Aramiz's testimony and could compare it to the surveillance video, which trial counsel argued did not support her recollection. By comparing her testimony to the content of the surveillance video during closing argument, trial counsel effectively attacked her credibility without affording her an opportunity to explain away any inconsistencies. Defendant's claim is meritless.

g. **Defendant's rights under the Fifth, Sixth and Fourteenth Amendments of the United States Constitution and Article I, Section 7 of the Delaware Constitution were violated by trial counsel's failure to effectively impeach Mariela Conejo-Cintura.[187]**

Defendant's claim mimics his last, where he argues trial counsel failed to vigorously cross-examine Mariela Conejo-Cintura "without any of the substantial potential impeachment material available to trial counsel given Mariela's significance to the State's case."[188] Defendant argues trial counsel's cross-examination was insufficient to "effectively impeach" the witness given the

---

[187] D.I. 174, p. 53.
[188] *Id.*, p. 53-54.

available evidence which could have been used to attack her credibility.[189] Trial counsel denies Defendant's claim, noting that the cross-examination of Mariela Conejo-Cintura "was consistent with the agreed-upon trial strategy between Defendant and trial counsel."[190]

Through Defendant's subjective consideration of Mariela Conejo-Cintura's testimony, he argues trial counsel should have done more. But, in postconviction, deference is given to trial counsel's strategic decisions, and cross-examination of a witness is a strategic decision which, if reasonable, does not form a basis for postconviction relief.[191]

Here, while trial counsel did not ask Mariela Conejo-Cintura as many questions on cross examination as Defendant would have preferred, trial counsel attacked her credibility. When asked if she told the DSP detective the truth during her interview, she said she did.[192] In closing, trial counsel argued otherwise. When asked if Defendant ever made any statement regarding the Mateo homicide at El

---

[189] *Id.*, p. 59. On July 23, 2024, Defendant filed a Supplement to Defendant's Response, claiming trial counsel failed to effectively use a cellphone extraction report to cross-examine Mariela Conejo-Cintura. D.I. 192. Defendant contends "the jury would not have found Mariela credible, and . . . the jury could not have found Defendant guilty." *Id.* Defendant's claim fails, as the test is not whether the jury *could* have found him not guilty but *would* have done so. As discussed *supra*, establishing prejudice requires more than a theoretical possibility the outcome could have been affected. *See Frey*, 974 F.2d at 358. Defendant presents Mariela Conejo-Cintura's testimony in a vacuum, but even if her testimony was disregarded by the jury, there remained overwhelming evidence of Defendant's guilt, and therefore Defendant cannot demonstrate prejudice.

[190] D.I. 212, p. 6.

[191] See *supra*, fn. 168.

[192] D.I. 66, 162:9 – 163:9.

Nuevo Rodeo, she told the police "nope, never [told] me that he did anything ever."[193] But, on direct examination, she testified to a conversation she had with Defendant where he essentially confessed to the Mateo murder while never explaining when the alleged incriminating conversation occurred.[194] In closing argument, trial counsel suggested Mariela Conejo-Cintura may have had more to gain with the police "by telling them something they want to hear,"[195] And, trial counsel questioned Mariela Conejo-Cintura's recollection, arguing to the jury:

> It's interesting. She says he tells her: I don't know what happened. Something just took me over. But then later: but I'm going to get every single one of them. Well, his actions belie that, right? He doesn't go back and try to get anybody else. There's not this him trying to hunt down the rest of this group. None of that exists. So that's how you start weighing the evidence.[196]

Trial counsel argued if Mariela Conejo-Cintura claimed Defendant said he was going to get all the Guatemalans and did not, why is her initial denial to the police that Defendant never spoke to her about the Mateo homicide not credible, and her post-police interview statement that Defendant admitted to killing Mateo believable? Counsel's cross examination was strategic and reasonable. Defendant's claim is meritless and he cannot establish prejudice, given the overwhelming

---

[193] D.I. 55, 110:17 – 18.
[194] *Id.*, 110:18 – 21.
[195] *Id.*, 110:20 – 23.
[196] *Id.*, 111:2 – 9.

evidence supporting a guilty verdict, independent of Mariela Conejo-Cintura's testimony.

### h. Defendant's rights under the Fifth, Sixth and Fourteenth Amendments of the United States Constitution and Article I, Section 7 of the Delaware Constitution were violated by trial counsel's failure to contest the State's evidence of motive.[197]

Defendant argues trial counsel was ineffective in failing to "contest the motive evidence presented by the State," and trial counsel's deficient performance "was objectively unreasonable conduct that resulted in substantial prejudice."[198] Defendant contends "for the State to prove intentionality in a case that would otherwise be characterized as a vehicle accident, the State would have to show some underlying problem between Defendant and Mateo to justify a murder charge. Without motive, acceleration of a vehicle into a person in the early morning hours simply cannot sustain a conviction for murder first degree standing alone."[199] Defendant does not cite to any record evidence in support of this claim.

Trial counsel denies Defendant's claim, asserting he used the State's witness's testimony to argue that the State failed to establish motive, referring to two of the

---

[197] D.I. 174, p. 62 – 63.

[198] *Id.*, p. 65.

[199] *Id.*, p. 65 – 66. Defendant's claim that this was simply a motor vehicle accident is not supported by the record. The surveillance video recording demonstrates Defendant intentionally pursued and ran Mateo down.

46

State's witnesses who described a scuffle inside the club while stressing that one or more witnesses had not seen a fight in the venue.[200]

Defendant's argument is consistent with his two previous claims -- that trial counsel failed to "vigorously" cross-examine the State's witnesses -- but this time the focus is not on a particular witness, but on motive. Defendant asserts trial counsel should have done more to combat the State's motive evidence, but motive is not necessary to prove the elements of any charge, including Murder First Degree. And, as is repeated above, the scope of cross examination is a strategic decision exercised by trial counsel, and if reasonably considered, it fails to form a valid basis for postconviction relief.[201]

Moreover, the record does not support Defendant's claim that trial counsel failed to challenge the State's evidence of motive. During his opening statement, trial counsel advised the jury:

> The State will parade six, eight, ten people. They'll talk about this incident inside, which is a non-incident. There are no punches thrown. There's no craziness that occurs when you think of a bunch of drunken cowboys getting into a fight. None of that occurs. Security officials will appear and say we separated them. We let one group out one door. We let the other group out another door. The one group, who is just as responsible – it takes two to tango – they let [Mateo's group] back in because they know them, because you're friends, you come here a lot. You guys can come back in. Mr. Mateo, who is part of that group, somehow didn't get back in. Either the bouncers didn't know him as

---

[200] D.I. 211, p. 6 – 7.
[201] See *supra*, fn. 168.

47

well as they knew everybody else, they didn't draw a connection, so he leaves.[202]

Trial counsel also elicited testimony during cross-examination of Irvin Ramirez-Recinos that the incident inside the venue was not a "fight," and Mateo wasn't present when the two groups pushed each other.[203] Additionally, again during cross-examination, Fernando Castillo de Leon conceded it wasn't a fight, but a push.[204] During closing argument, trial counsel specifically addressed the State's motive evidence:

> So, let's just talk briefly about some of the things they could have run and proved beyond a reasonable doubt, and how they did not do that. First of all, let's start with motive, just as a place to start. [The prosecutor] is right. She doesn't have to prove motive. No one's going to hear you mention motive until she mentioned it earlier today.
> This was a pushing match between two people, even though when they were asked questions by the prosecutor, "this was a fight," and they say, oh, yes, it was a terrible fight. Now, wait a minute. No. He pushed us once. We pushed him once. That was the end of it. We didn't get thrown out. He got escorted out. Is that motive to kill somebody because there was a pushing match? Two of the young men who were involved downplayed it so much, they said it was nothing. You know, we were there. Push, push. They leave. They know us. We don't leave. They don't even see Mr. Mateo there. They said, no, he wasn't there. It was just us two involved. Do you remember? Those were the first two young men who testified.[205]

---

[202] D.I. 53, 38:23 – 39:14.
[203] D.I. 60, 77:19 – 78:17.
[204] *Id.*, 124:2 – 10.
[205] D.I. 55, 98:20 – 99:11.

The record does not support Defendant's claim that trial counsel was ineffective for failing to effectively cross-examine witnesses regarding the State's evidence of motive. Trial counsel's strategic decision to address motive in the manner he did was reasonable, resulting in a credible argument that the State's motive evidence was not supported by the record.

> **i. Defendant's rights under the Fifth, Sixth and Fourteenth Amendments of the United States Constitution and Article I, Section 7 of the Delaware Constitution were violated by trial counsel's failure to effectively investigate the State's evidence against Defendant prior to trial.[206]**

Defendant contends trial counsel was "ill-prepared to litigate the case."[207] He suggests "[h]ad trial counsel diligently reviewed the State's case against Defendant, trial counsel would have been properly prepared for the eventual issues presented at trial and litigated them in a way that subjected those issues to meaningful adversarial testing."[208] Defendant argues trial counsel's alleged unpreparedness led him to provide ineffective assistance as laid out in the majority of his postconviction claims. According to Defendant, trial counsel was unprepared and the evidence to substantiate this claim includes trial counsel's decision to: (a) stipulate to the manner of Mateo's death; (b) bolster Detective Mauchin's testimony; (c) allowing Detective Mauchin to identify him in video surveillance; (d) ineffectively cross-

---

[206] D.I. 174, p. 68.
[207] *Id.*, p. 69.
[208] *Id.*

examine of Madelyn Aramiz; (e) ineffectively cross-examine Mariela Conejo-Cintura; (f) ineffectively address the State's motive evidence; (g) fail to convince him to request a lesser included offense jury instruction; and (h) failure to hire an accident reconstruction expert.[209]

Trial counsel responds that he was "well versed in the State's discovery."[210] He spoke and/or met with witnesses "present both inside and outside the club on the night in question."[211] He met with Defendant at the prison on multiple occasions prior to trial, where he and the defendant "discussed evidence, trial strategy, as well as jury instructions and whether the Defendant wanted to include a lesser included offense jury instruction for Second Degree Murder."[212] The Defendant opted for an all-or-nothing strategy and refused to request a lesser included offense instruction.[213]

As the Delaware Supreme Court held in *Cooke v. State*, when considering a defendant's "duty to investigate" claim:

> *Strickland* does not require that counsel pursue every line of investigation no matter how unlikely to uncover helpful evidence it would be.[241] The duty to investigate requires only that investigatory decisions be reasonable. It "does not require that a criminal defense attorney leave no stone unturned and no witness unpursued."[242] This is

---

[209]  *Id.*, p. 69-70.
[210]  D.I. 211, p. 7.
[211]  *Id.*
[212]  *Id.*
[213]  *Id.*

because "[d]efense lawyers have 'limited' time and resources, and so [they] must choose among 'countless' strategic options.[214]

Applying *Cooke's* reasonableness standard, Defendant does not identify any specific evidence trial counsel failed to review.

The record reflects that trial counsel was well-prepared, and he made strategic decisions when cross-examining witnesses which were consistent with the agreed upon trial strategy. Defendant has failed to demonstrate trial counsel's performance fell below an objective standard of reasonableness and has not explained how more time spent investigating the case would have resulted in a different outcome. He does not identify any specific evidence or name any witness trial counsel should or could have reviewed or interviewed which would have resulted in an acquittal of all charges. Simply mimicking a list of unsubstantiated and meritless postconviction claims is not a basis for relief when alleging a duty to investigate claim. Defendant's claim is unsubstantiated and subject to summary dismissal.[215]

---

[214] *Cooke*, 2025 WL 16395, at *36 (citing *Wiggins v. Smith*, 539 U.S. 510, 533 (2993); *Berryman v. Morton*, 100 F.3d 1089, 1101 (3rd Cir. 1996); *Dunn v. Reeves*, 594 U.S. 731, 739 (2021) (quoting *Harrington*, 562 U.S. 86, 106-07)).

[215]    To the extent Defendant now claims trial counsel's failure to review the evidence resulted in ineffective assistance regarding "Defendant's decision to not pursue a lesser included offense instruction at trial," (D.I. 174, p. 75), he fails to identify *any* evidence that trial counsel failed to review. Moreover, Defendant's claim that his decision to not pursue a lesser included offense instruction because of his "then extant language barrier" is baseless. *Id.* Defendant rejected a clear opportunity to request this Court instruct the jury on the lesser included offense of Murder Second Degree after consulting with trial counsel. D.I. 55, 69:1 – 70:10.

To the extent Defendant now argues trial counsel was ineffective for failing "to present a defense case," (D.I. 174, p. 77) his argument is convoluted at best. Defendant claims "trial counsel's decision not to present a defense case was premised upon the erroneous conclusion that the State would fail to present adequate facts to find Defendant guilty of all charges alleged." *Id.*

**j. Defendant's rights under the Fifth, Sixth and Fourteenth Amendments of the United States Constitution and Article I, Section 7 of the Delaware Constitution were violated by trial counsel's ineffective representation in closing argument.[216]**

Defendant contends that trial counsel "relied entirely upon [his] closing argument to state a case for Defendant's innocence."[217] He also argues trial counsel "launched into a hair-brained scheme to suggest Mariela [Conejo-Cintura] was lying and may have been induced to lie by the State."[218] Defendant suggests "trial counsel was deflated and thoroughly beaten by himself."[219] He contends trial counsel's opportunity to "effectively represent Defendant had ended prematurely."[220] Finally, Defendant believes "had trial counsel not presented an objectionable closing

---

If that were the case, trial counsel would not have, according to Defendant, attempted to persuade "Defendant to accept the State's guilty plea, up to and including recruiting Defendant's family to help with that persuasion." *Id.*, p. 68-69. Without any further detail or explanation, Defendant contends trial counsel should have presented a defense case "using witnesses such as Raul," but he fails to provide any evidence Raul would have contributed to his defense or how Raul's testimony would undermine the State's evidence. *Id.* at 78. Defendant has failed to substantiate this claim, and it is subject to summary dismissal.

As to Defendant's reliance on *United States v. Chronic,* 466 U.S. 648 (1984) (D.I. 174, p. 79-80), the U.S. Supreme Court rejected the circuit court's mechanical application of five factors which were used to infer that respondent's constitutional right to effective representation had been violated. *Id.* at 652. And, importantly, those five factors do not assist Defendant here. In this case, trial counsel was an experienced criminal defense attorney who had ample time to investigate the case and prepare for trial. Defendant has failed to demonstrate trial counsel's performance was beyond the bounds of competence demanded of defense attorneys in criminal cases. Trial counsel was an effective advocate for Defendant throughout the prosecution of this matter. *Chronic* is inapplicable.

[216] D.I. 174, p. 80.
[217] *Id.*
[218] *Id.*
[219] *Id.*, p. 81.
[220] *Id.*

argument, there is a reasonable probability the outcome of the trial would have been different."[221]

Trial counsel denies Defendant's claim, and contends Defendant failed to allege any "facts to support a conclusion that the jury would have reached an alternative verdict had trial counsel presented an alternative closing argument."[222]

Defendant's argument is misplaced. Trial counsel's role was not "to state a case for Defendant's innocence," but rather, consistent with the agreed upon trial strategy, to argue that the State failed to prove he was guilty beyond a reasonable doubt. Trial counsel also argued that the State failed to present credible evidence of motive – that there was not in fact a "fight" in the venue that evening, but at best it was a shoving match not worthy of taking another's life over.[223] And, there was no evidence presented that the Defendant knew the victim, or that the victim was involved with the incident inside the venue.[224]

Defendant also claims the State's civilian witnesses were not credible, and a cumulation of the evidence constituted reasonable doubt for which the jury should have found Defendant not guilty. In light of the verdict, the jury clearly disagreed with Defendant's subjective assessment and conclusion. And, Defendant failed to

---

[221] *Id.*, p. 83.
[222] D.I. 211, p. 8.
[223] D.I. 55, 98:13 – 99:15.
[224] *Id.*, 99:20 – 22.

identify any fact(s) that the jury could have relied upon which would have led them to reach a not guilty verdict with an alternative closing argument. Simply because trial counsel's closing argument was not successful in convincing the jury Defendant was not guilty does not mean his closing argument was neither competent nor reasonable.

> **k. Defendant's rights under the Fifth, Sixth and Fourteenth Amendments of the United States Constitution and Article I, Section 7 of the Delaware Constitution were violated by the cumulative effect of any two or more of the above-described violations.[225]**

To obtain relief under the theory of cumulative error, those errors must derive from multiple errors that caused "actual prejudice."[226] As discussed above, the record is devoid of any professional errors committed by trial counsel, and a collective review of the defense reveals no material defect that deprived Defendant of a substantial right or resulted in manifest injustice. Defendant's cumulative error claim is meritless.

## VI. CONCLUSION

As a result of Defendant's failure to overcome Rule 61(i)'s procedural bars, I recommend Claim Two from the initial Motion be summarily dismissed as procedurally barred pursuant to Rule 61(i)(3); Supplemental Claim Three from

---

[225] D.I. 174, p. 83.
[226] *Swan v. State*, 248 A.3d 839, 884 (Del. 2021) (*quoting Michaels v. State*, 970 A.2d 223, 231-32 (Del. 2009) (citing *Fahy v. Horn*, 516 F.3d 169, 205 (3rd Cir. 2008))).

54

Defendant's Response be summarily dismissed as previously adjudicated pursuant to Rule 61(i)(4); and Supplemental Claims One through Nine from Defendant's Response be summarily dismissed as procedurally barred as untimely filed pursuant to Rule 61(i)(1).

Additionally, after conducting a substantive review of each of Defendant's claims, I conclude all of Defendant's claims suffer from one or more of the following defects:  they are factually unsubstantiated, meritless, and/or Defendant has failed to demonstrate prejudice to *Strickland's* exacting standards.

For all the aforestated reasons, I recommend Defendant's Motion for Postconviction Relief be **SUMMARILY DISMISSED** as procedurally barred and meritless.

Postconviction counsel's Motion to Withdraw is **MOOT**.

**IT IS SO RECOMMENDED.**

*/s/ Martin B. O'Connor*
The Honorable Martin B. O'Connor